# Ross v. Pool.

*Bill in Equity to Enjoin Sale of Land under Execution, and to Obtain a Title-deed to Lands.*

*Decree of chancellor on facts; when will not be disturbed.*—The finding of the chancellor as to the facts will not be disturbed, unless it is affirmatively shown by the record that he erred in his rulings thereon.

APPEAL from the Chancery Court of Perry.

Heard before the Hon. CHAS. TURNER.

The record in this case is quite voluminous—containing a thousand pages; but from the view taken by this court, it becomes unnecessary, even if it were otherwise practicable, to give more than the following outline of the case:

On the first day of October, 1866, Webb Ross filed his bill of complaint against A. J. Pool, John D. Ragland, and others, which was afterwards dismissed as to all the defendants except Pool and Ragland. The bill states that on the 22d of August, 1865, Ross contracted with Pool for the purchase of an undivided third of a tract of land called the "Chiles and Brown places," in Perry county, and some personal property, for the sum of $15,000, to be paid on the first day of March, 1866; that no deed was made, and that the land was about to be sold under divers executions in the hands of the sheriff. That Ross paid the purchase-money on the sixth of April, 1866. The object of the bill was to enjoin the sale of the land under the executions, and to obtain from Pool a deed of conveyance for the same.

Ragland answered the bill, assailing the transaction between Pool and Ross as fraudulent; and before the cause was decided, died. The suit was revived in the name of Hall, his administrator.

After the cause had been submitted for final decree, Hall, administrator, filed a cross-bill to compel Ross to account for the value of the personal property, and of the use and occupation of the land.

The court set aside the contract between Ross and Pool as fraudulent, and held Ross accountable for the rents and profits of the land and the value of the personal property. From this decree Ross appealed.

[Ross v. Pool.]

Ross, who had resided in Kentucky for many years, failed, and was sold out by the sheriff, and some time in 1862, he left his family in Kentucky and came South. In 1864 he entered the service of A. J. Pool, sometimes called Jeff. Pool, of Perry county, Alabama, and built and kept a small whisky-still for him. At that time Pool was possessed of real and personal estate in Perry county, of considerable value, but was heavily in debt. At the close of the war the following were some of the debts outstanding against him, to-wit: A balance due on judgments in the Probate Court of Dallas county in favor of McNeil, distributee, $16,000; to George W. Brown, about $10,000; to J. F. Cantrell, about $38,000; to John D. Ragland, about $115,000; to Horton, $6,000, and Tedwell, $12,000; total, $197,000. Cantrell sued and obtained a judgment against Pool on his claim in the Circuit Court of Perry, in October, 1865. Ragland obtained a judgment against him in the same court in May, 1866, for about $38,000, and another in 1867 for upwards of $67,000. Horton obtained a judgment on his claim by the award of arbitrators in August, 1865.

Soon after the war closed, Pool saw he was insolvent, and his creditors becoming importunate, " he conspired," as is claimed, " with Ross and one John P. Shropshire, a kinsman of Ross, and an acquaintance and friend of Pool, to cheat and defraud his creditors." Shropshire resided near Ross, in Kentucky.

Pool owned a plantation called the " Scott place," and two adjoining parcels of land, one called the " Chiles place," the other the " Brown place." They, however, constituted but one plantation, called the " Chiles and Brown place," of which Ross claimed an undivided third. The two remaining thirds of that place were sold by Pool to John I. Rogers, the son-in-law of Ross, for about $32,000 on a credit. Ross bought or pretended to buy, on a credit, for the price of $15,000, but never gave any note for the purchase-money. Rogers gave his notes for his share of the purchase-money, and Pool soon afterwards fraudulently disposed of them.

Ross produced in evidence an instrument in writing bearing date the 22d of August, 1865, a copy of which is annexed to the bill. This writing is signed by said Pool and by said Ross, and substantially shows that Pool sold Ross the said share of the said property for $15,000, and was to make title on the payment of the purchase-money. Pool calls it a bond for title.

On the sixth day of April, 1866, Pool, Ross, and Shrop-

shire met together at a hotel in Selma, called the " Troup·
House ;" Ross is furnished with $15,000 by Pool, and Shrop-
shire invites into the room Watts and Sturdevant, two re-
spectable citizens, to count and witness the payment of the
money by Ross to Pool. It was after night, the witnesses·
entered the room occupied by Ross and Pool, and·thereupon
Ross placed the money upon the table, stated to them that
he was going to pay it to Pool for the property he had pur-
chased from him, and that he wished them to count the
money and witness its payment. He at the same time pro-
duced the said contract. Watts and Sturdevant counted the
money, and Ross handed it to Pool, and he wrote on the·
contract the receipt acknowledging the payment of the sum·
of $15,000, in full discharge, which was attested by the wit-
nesses. The purchase-money, according. to this contract,·
was due on the first day of March, and interest for one·
month was due, yet none was paid, and no·explanation is
given why none was claimed or paid. No deed of conveyance
ance was made, and no explanation is given why one was
not made. " The next day," it is stated, " Pool and Shrop-
shire exulted, in the presence of Mrs. Pool, over the success
of their trick, and boasted of how well they had played it off."

At the time of this " pretended payment," executions on
the McNeil judgments were in the hands of the sheriff.
Pool had in the meantime disposed of about three hundred
or four hundred bales of cotton, and other personal property,
but had paid no debts. The lands were advertised for sale
on the first Monday in August, under the McNeil executions,
and also under executions on the judgments .in favor of
Cantrell and Ragland. But Ragland bought the McNeil
judgments, and the sale was postponed until the first Monday
in October, 1866. Rogers appeared at the court-house on
the day of sale, and admitted that he owed for the land he·
bought, and entered into an agreement with Ragland to pay·
the money to him, if Ragland would give him the title to the
two-thirds of the land. Ross was absent, but Pool said he·
(Ross) had not paid the purchase-money, and that Ragland
could make a similar arrangement with him, if he, Ragland,
would give Pool credit on his debts for the amount of the
money he should collect from Ross and Rogers.

Ross had filed his bill and sued out his injunction to pre-
vent the sale of the undivided third of said land, contracted
for by him, under the *pretence that he had paid for the same
on the sixth day of April*, 1866. The residue of the land was
sold and was purchased by Ragland.

[Ross v. Pool.]

Afterwards, to-wit, on the 26th day of April, 1866, (that is, after the time when the money was paid,) Ross made and acknowledged a deed of conveyance for a tract of land owned by him in Missouri, and thereby granted the same to one Augustus Shropshire, of Kentucky, the brother of Ross' wife. This deed was made to Shropshire under the pretence that Ross was to pay Pool the $15,000 in that tract of land whenever Pool made Ross good titles to the property bought by him from Pool, and then Shropshire was to convey the Missouri land to any person Pool might wish. Afterwards, to-wit, on the — day of March, 1867, Pool took this deed to Augustus Shropshire, and at his request Shropshire conveyed the land to James Pool, of Texas, the brother of A. J. Pool. But afterwards, when he was about to take the benefit of the bankrupt act, he (James Pool) conveyed the land by deed to William Penny, who took possession of it as the agent of A. J. Pool, and upon an agreement in writing to hold it for Pool's benefit and to convey it to any one he might wish. In 1868, A. J. Pool also took the benefit of the bankrupt act.

Ross became very uneasy, for fear he would lose his Missouri land, and by some arrangement with Pool and Penny, Penny agreed to hold under Ross; and in 1873, for the alleged consideration of about $350, Penny executed a deed conveying the Missouri land to Ross, and abandoned the premises. About that time Ross gives Pool a note for about $2,500, and takes Pool's deposition as a witness in this case for the first time.

According to the written contract produced, Ross was to pay the $15,000 in money. Nothing is said about a payment thereof in Missouri land. But Pool swears: "I was to get $15,000 in *cash, but the same was to be paid in* 450 *acres in land in Missouri, if I liked it.* This part of the contract in relation to the Missouri land *was not reduced to writing.*" . . "The *only paper* signed was an obligation on my part to make title *when the money was paid.*" But Ross says: "The only other instrument of writing executed by me having any connection with said trade, was a power of attorney given by me to John P. Shropshire, authorizing him to convey a tract of land in Missouri to Pool, at a valuation of $9,500, in *part* payment of the purchase-money. . . . And I also signed a paper containing a description and valuation the Missouri land, and *the terms, &c., agreed upon.* These were the only papers I signed regarding the trade . . " They differ, also, in this: Pool says the Missouri land was to

[Ross v. Pool.]

be taken, if he liked it, in full payment of the $15,000; while Ross says it was to be taken at a valuation·of $9,500· only. It does not appear that Ross gave Pool any note or· other security for the payment of the $15,000; but it appears that Ross executed another paper, to-wit: the deed to·· Shropshire.

Mrs. Mary M. Pool, the wife of A. J. Pool, testifies that Pool and Ross told her " that Ross was to *give Pool the land in Missouri in exchange for the property Pool sold him.*"

Shropshire, a witness for Ross, testifies that, " At the time of the trade in Aûgust, 1865, it was *agreed* that Pool should take from Ross, in payment of said property so bought by Ross from Pool, a tract of land which Ross owned in Salem county, Missouri."

Pearce, a witness, says that in May, or June, 1860, Ross · told him that "he had traded to said Pool his land he owned in Missouri, for one-third of the plantation he then lived on," and that he made and executed a deed to A. C. Shropshire, who was to make a deed to Pool, " *after Ross got his deed from Pool.*" He further testifies that Ross gave as an excuse for not taking steps to get back his ·Missouri land, that " *he was waiting to see if Jeff. Pool could make a good title to the land he (Ross) then lived on.*"

Ragland swears that he had several conversations with Ross in relation to this matter, and that Ross, in all the con- · versations, told him that he bought said propertv from Pool,·· and was " *to pay him therefor the tract of land in Missouri.*" · And he further says : " He (Ross) told me that by the request of Pool he (Ross) *was to convey* the Missouri land to *Augustus Shropshire, of Kentucky, the brother of his wife.*" · And that the deed was to be delivered to Augustus Shropshire whenever A. J. Pool should deliver to him (Webb· Ross) a deed conveying good titles to the land sold to him by Pool. And that John Shropshire was to return the deed to Ross " *whenever it would appear that Pool could not make good title.*"

Again he says : " Webb Ross never did tell me that he was · to pay Pool any money, or give him anything else but the Missouri land in exchange for the third interest in the land in Alabama."

Mrs. Pool went to Kentucky in 1865, and she swears that she heard Ross and Pool both say that the trade was, that Ross was to give Pool, for the land in Alabama, his land in Missouri. And, again, on her return from Kentucky, in November, 1865, she says Ross had taken possession of his·

[Ross v. Pool.]

one-third of the land received by him of said Pool *in exchange for the land in Missouri.*

Attached to Mrs. Pool's deposition is a writing, signed by William Penny, (Pool's half-brother,) showing that James L. Pool conveyed the Missouri land to him, and in the words of Penny, as set forth in this writing, *"I am to hold these lands for the benefit and use of Anderson J. Pool;"* and *"I am to make a deed to the above described lands to him or to any one he may wish."* It appears that the deed by Ross, conveying the lands to A. C. Shropshire, was delivered to Shropshire; and that, on the 16th March, 1867, he conveyed it, by deed, to James L. Pool, at the request of A. J. Pool; and that James L. Pool, on the 14th day of November, 1868, conveyed the lands to W. W. Penny, and that on the 19th of November, 1868, Penny executed to Pool the writing acknowledging he held the lands for the use and benefit of Pool; and that Penny remained in possession until 1873, and conveyed the lands back to Ross. And Ross says, *"I rented said Missouri lands to William Penny, and Penny is now in possession."*

As to the deed to A. C. Shropshire, Ross says Pool stole the deed to A. C. Shropshire out of John P. Shropshire's trunk. S. P. Shropshire says the same thing. And Ross says that Pool got a deed to the land from A. C. Shropshire by *fraudulent and false representations.* But Pool swears that he knows nothing of the deed to A. C. Shropshire.

Ross swears that on the sixth day of April, 1866, he paid Pool $15,000 in national currency, or greenbacks, for the land. Pool and John P. Shropshire swear to the same thing, and Sturdevant and Watts, witnesses in the case, testify that they were present and counted the money, and saw it handed by Ross to Pool.

It is not questioned, that on that day Ross handed the money to Pool. But defendats say *"* it was *all a sham;* the money did not belong to Ross; *it belonged to Pool,* and was furnished by him to go through with the ceremony. Pool and Ross and Shropshire, three corrupt and villainous conspirators, knew to whom the money belonged. But Watts and Sturdevant did not, and were merely called in to count and witness the transmission of the money from Ross to Pool."

Ragland testifies, that he had several conversations with Ross in relation to this trade, and that Ross told him in 1869 that he had purchased land from Pool, and some stock, and was *" to pay him therefor in a tract of land in Missouri.* Webb Ross never pretended that he was to pay anything

..else besides the land in Missouri. He told me that at the *request of Pool*, he was to convey the Missouri land to *Augustus Shropshire*, of Kentucky, the brother of Ross' wife; and that he (Ross) *prepared* and *signed a deed accordingly*, and placed it in the hands of John Shropshire, to be delivered to Augustus as a deed, *whenever* A. J. Pool should *deliver* to him (Ross) a *deed conveying good title to the*" land he bought from him.

Again, Ragland says: " Webb Ross told me that the deed .had been *stolen* out of John Shropshire's trunk, and that he was *afraid he would lose his Missouri land*. Ross told me that the clerk in Missouri wrote him that the fraudulent deed to Augustus Shropshire had been received and recorded."

Mrs. Mary M. Pool, the wife of A. J. Pool, swears that in August, 1865, both Ross and Pool told her "that Ross was to give Pool the *land* in Missouri *in exchange* for the property Pool sold him."

J. P. Shropshire testifies that " at the time of the trade in August, 1865, it was agreed that Pool should take from Ross *in payment* for said property, so bought by Ross from Pool, a *tract of land* which Ross owned in Saline county, Missouri."

Pearce testifies, that in May or June, 1869, Ross told him "that he had traded to said Pool his land in Missouri for one-third of the plantation he (Ross) then lived on; that he made a deed to Augustus Shropshire, and gave the deed to John Shropshire for safe-keeping. And Augustus Shropshire was to make a deed of said Missouri land *to any one that Pool might name, after Ross got his deed from Pool;* that John Shropshire said that Pool stole the deed out of his trunk, and carried the deed to Augustus Shropshire, and told said Augustus it was all right, and to make a deed to Jim Pool, of Texas; and that Jim Pool had taken the benefit of the bankrupt act, and Jeff. Pool did not know it; and *damn* Jeff. Pool—he was trying to swindle him out of his Missouri land. I then asked Ross why he did not write to the probate judge of the county in Missouri in which the land was situated not to record the deed Augustus Shropshire made to Jim Pool, and Ross said he was waiting to see if Jeff. Pool would make him a good title to the land he (Ross) then lived on. Ross then said he did not much care if Jeff. Pool never made him a good title to the land he (Ross) then lived on, as the land in Missouri was now worth more than the land he got from Pool in Alabama. . . Ross also said he did not pay Jeff. Pool any money for the land he got from him in Alabama."

The chancellor decreed against the complainant in the orignal bill, and the decree is now assigned as error.

WATTS & SONS, for appellant.

W. M. BROOKS, *contra*.

STONE, J.—If the testimony of Ross, Pool and Shropshire be believed, Ross purchased and paid for the land and other property in controversy, and his bill ought to be maintained. But Pool and Shropshire are effectually discredited, and we feel it our duty to discard their testimony from our consideration. Watts and Sturdevant confirm him in the fact of handing the money to Pool; but that fact is of a class of which the counterfeit is not easily distinguished from the genuine. There are some inconsistencies in Ross' statement,. viewed by itself. Any reader of his testimony will have his attention arrested by apparent discrepancies. He testifies that when he purchased, and when he paid, he had no knowledge of Pool's insolvency, or even of his embarrassment; yet,. when he came to pay the money, there was a degree of particularity—a desire to hedge it about with a " cloud of witnesses"—that ill accords with a consciousness of a plain,. business transaction. Having, as Ross pretends, full confinence in Pool's ability to make him a good title, and in his solvency, it is a matter of surprise, if not of suspicion, that he should have called witnesses to the payment of the money.. Another unexplained circumstance, is the singular connection, or apparent relation, which the lands in Saline county,. Missouri, bear to the alleged purchase of Ross from Pool. Three witnesses, Ragland, Brooks and Pearce, give testimony of Ross' admissions, tending to show that the one tract of land was the consideration of the other. Mrs. Pool's testimony is confirmative of this. This testimony, unrebutted, is calculated to raise a doubt of the *bona fides* of the payment of fifteen thousand dollars in money, as claimed by him. Shropshire, to whom Ross conveyed the Missouri lands, and Penny, to whom title was afterwards made—not to mention James Pool—could doubtless explain this transaction; and if, as Ross contends, his conveyance of the Missouri land to Shropshire had no connection whatever with his purchase from Pool of the lands in controversy, it was due alike to his interest and his character that he should have taken their testimony. It was not done, and no excuse is offered why it was not done. Another fact should not be

[Hudson, Kennedy & Co. v. Vaughan's Executors.]

overlooked. The testimony of the witness, Polk, goes very far to disprove Ross' ability to pay the fifteen thousand dollars he claims to have paid. The objection to the manner in which this proof was made is not well taken.—*Graham v. Lockhart*, 8 Ala. 9; *Pl. and Mer. Bank v. Borland*, 5 Ala. 531. The opinion of the chancellor in this cause is a very carefully considered argument. He presents the strong points of the evidence, which tend to cast suspicion on the transaction; and there is a failure to explain, or break the force of those circumstances. We find nothing in this record which authorizes us to declare that the chancellor erred in his ruling on the facts.—*Cummings v. McCullogh*, 5 Ala. 324; *Hamilton v. Blackwell*, December term, 1877; *Marshall v. Croom*, at this term.

Affirmed.